*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LARRY JOHNSON,

      Plaintiff-Appellant,

v

BEAUMONT HOSPITAL-TRENTON,
OAKWOOD HEALTHCARE, doing business as
BEAUMONT HOSPITAL-TRENTON,
BEAUMONT HEALTH, FAIRLANE SENIOR
CARE AND REHAB CENTER, LLC, and PRIME
HOMECARE AGENCY, LLC,

      Defendants-Appellees.

UNPUBLISHED
November 12, 2025
3:06 PM

No. 369349
Wayne Circuit Court
LC No. 22-010673-NH

Before: REDFORD, P.J., and FEENEY and BAZZI, JJ.

PER CURIAM.

In this medical malpractice action, plaintiff, Larry Johnson, appeals as of right the trial court's order granting summary disposition to defendant Fairlane Senior Care and Rehab Center, LLC (Fairlane Senior Care), under MCR 2.116(C)(7) (immunity granted by law) and (C)(8) (failure to state a claim on which relief can be granted). Plaintiff further challenges the trial court's orders granting summary disposition to defendants Beaumont Hospital-Trenton, Oakwood Healthcare, doing business as Beaumont Hospital-Trenton, and Beaumont Health (collectively, Beaumont defendants) pursuant to MCR 2.116(C)(7) and (C)(8), and to defendant Prime Homecare Agency, LLC (Prime Homecare), under MCR 2.116(C)(7), (C)(8), and (C)(10) (no genuine issue of material fact). For the reasons set forth in this opinion, we affirm.[1]

---

[1] Plaintiff previously filed an appeal in this Court regarding the underlying action, but the appeal was dismissed "for failure to pursue the case in conformity with the rules. MCR 7.201(B)(3) and 7.216(A)(10)." *Johnson v Beaumont Hospital-Trenton*, unpublished order of the Court of Appeals, entered January 10, 2023 (Docket No. 363970).

## I.  BASIC FACTS AND PROCEDURAL HISTORY

On March 29, 2020, 63-year-old plaintiff presented to the emergency services department of Beaumont Hospital-Taylor seeking treatment for "increased shortness of breath and cough." Subsequent medical evaluation confirmed that plaintiff tested positive for coronavirus (COVID-19), and he required intubation for respiratory support.  Five days later, on April 3, 2020, plaintiff was transferred to Beaumont Hospital-Trenton for further care, where he remained until April 21, 2020.  Upon admission, plaintiff's principle diagnosis was determined to be COVID-19, with secondary diagnoses of acute kidney injury, chronic back pain, hyperchloremia, hyperkalemia, hypermagnesemia, hypernatremia, myocardial infarct, sleep apnea, and other conditions.  While hospitalized, plaintiff was placed on mechanical ventilation and he received treatment with Zithromax and Plaquenil.  Plaintiff additionally underwent hemodialysis and he received consultations with the departments of pulmonology, nephrology, cardiology, hematology, critical care medicine, and infectious diseases.  There was no mention of any pressure injuries or pressure ulcers[2] in the Beaumont documentation.

Once plaintiff had shown sufficient improvement, approximately 18 days later, he was transferred to Fairlane Senior Care for further treatment.  The facility's admission record indicated that plaintiff suffered from a variety of medical conditions, including viral pneumonia, acute respiratory failure, and COVID-19.  According to plaintiff, in the days following his admission, he was subsequently assessed as having an "unstageable pressure ulcer"[3] on his right buttock, and an abrasion on his scrotum.  Plaintiff further reported that he received regular wound assessments; however, he simultaneously asserted that the nursing staff failed to prevent the development of the pressure ulcer or abrasion and inadequately documented their progression.  On May 12, 2020, plaintiff was discharged from Fairlane Senior Care to his residence to continue receiving in-home services.

On May 15, 2020, Prime Homecare began providing home-based medical care to plaintiff approximately three times per week.  The intake summary listed, in part, COVID-19 infection and a pressure ulcer on plaintiff's right buttock as part of his past medical history; the Braden Scale[4]

---

[2] Pressure ulcers, otherwise known as bedsores, are "injuries to the skin and the tissue below the skin that are due to pressure on the skin for a long time."  Mayo Clinic, *Bedsores (Pressure Ulcers)* <https://www.mayoclinic.org/diseases-conditions/bed-sores/symptoms-causes/syc-20355893> (accessed October 27, 2025).

[3] An "unstageable pressure injury/ulcer" is defined as "full-thickness skin and tissue loss in which the extent of tissue damage within the ulcer cannot be confirmed because it is obscured by slough or eschar."  Louisiana Department of Health, Appropriate Classification of Wounds and Staging of Pressure Injuries/Ulcers <https://ldh.la.gov/assets/medicaid/rateaudit/docs/AppropriateClassificationStaging.pdf> (accessed October 27, 2025).

[4] The Braden Scale "can be used to identify patients at-risk for pressure ulcers. .. .  The scale consists of six subscales and the total scores range from 6-23.  A lower Braden score indicates higher levels of risk for pressure ulcer development.  Generally, a score of 18 or less indicates at-

assessment, conducted as part of the intake process, yielded a score of 17, placing plaintiff at the lowest risk for developing pressure ulcers. Plaintiff was further identified as having one unstageable deep tissue pressure ulcer and one "Stage 1" pressure ulcer, presumably with the former located on plaintiff's right buttock and the latter on his groin. Under the "Goals and Interventions" section of the intake summary, one of the stated goals was that the "patient will be free from signs and symptoms of respiratory distress," with the assistance of a respiratory care plan addressing acute lung disease.

Plaintiff continued to receive services from Prime Homecare until August 25, 2020, including regular wound assessments and wound care. However, plaintiff alleged that, as a result of Prime Homecare's negligence, he developed a stage IV decubitus ulcer[5] on his right buttock, which necessitated multiple hospitalizations and debridement procedures.[6] The discharge summary provided that as of August 25, 2020, the pressure ulcer on plaintiff's right buttock was classified as "Stage 4," indicating "Full thickness tissue loss with exposed bone, tendon, or muscle. Slough or eschar may be present on some parts of the wound bed. Often includes undermining and tunneling." Plaintiff was discharged from Prime Homecare "to the care of Dr. Halloran, wound care clinic."

On September 9, 2022, plaintiff filed a seven-count complaint in the Wayne Circuit Court advancing negligence claims against the nursing staff of Beaumont Hospital-Trenton, Fairlane Senior Care, and Prime Homecare, in addition to all defendants themselves. For the counts against the pertinent defendants' nursing staff, plaintiff contended that the staff were negligent in their treatment of plaintiff's pressure ulcers and failed to adhere to the standard of care for medical professionals. Plaintiff further delineated actions the nursing staff of Beaumont Hospital-Trenton, Fairlane Senior Care, and Prime Homecare, purportedly neglected to do when treating plaintiff, including failing to properly evaluate plaintiff's risk factors for developing pressure ulcers, repositioning plaintiff to prohibit the progression of wounds, administering appropriate treatment, and other derelictions of their duties. Plaintiff alleged that because of the cited inactions, the

---

risk status." Agency for Healthcare Research and Quality, *Preventing Pressure Ulcers in Hospitals* <https://www.ahrq.gov/patient-safety/settings/hospital/resource/pressureulcer/tool/pu7b.html> (accessed October 27, 2025).

[5] A "decubitus ulcer" is defined as "damage to an area of the skin caused by constant pressure on the area for a long time. This pressure can lessen blood flow to the affected area, which may lead to tissue damage and tissue death." National Cancer Institute, *NCI Dictionary of Cancer Terms* <https://www.cancer.gov/publications/dictionaries/cancer-terms/def/decubitus-ulcer> (accessed October 27, 2025).

[6] "Debridement is a procedure for treating a wound in the skin. It involves thoroughly cleaning the wound and removing all hyperkeratotic (thickened skin or callus), infected, and nonviable (necrotic or dead) tissue, foreign debris, and residual material from dressings. Debridement can be accomplished either surgically or through alternate methods such as use of special dressings and gels." University of California San Francisco Department of Surgery, *Debridement* <https://surgery.ucsf.edu/procedure/debridement> (accessed October 27, 2025).

nursing staff "commit[ed] one or more negligent acts and/or grossly negligent acts and/or omissions, and breached the applicable standard of care . . . ."

For the counts against defendants themselves, plaintiff pleaded a list of acts defendants allegedly omitted in training and supervising the nursing staff, and he similarly advanced that these failures to act were negligent or grossly negligent. Plaintiff additionally asserted that the alleged conduct of defendants and their respective nursing staff led to the significant development of his injuries, resulting in extensive hospitalization, surgical care, and wound treatment. Plaintiff attached an affidavit of merit from Ana Ramirez, RN, to his complaint. The affidavit essentially reiterated the allegations concerning defendants and defendants' nursing staff from plaintiff's complaint. Ramirez maintained that the enumerated acts defendants and defendants' staff neglected to perform were the proper standard of care and that the failure to perform these acts constituted negligence. The affidavit made no reference to gross negligence.

In lieu of filing an answer, Beaumont defendants jointly moved for summary disposition under MCR 2.116(C)(7) and (C)(8) on October 12, 2022. Beaumont defendants contended that MCL 691.1475, a section of the Pandemic Health Care Immunity Act (PHCIA), MCL 691.1471 *et seq*., barred plaintiff's claims because defendants were a "health care provider or health care facility," and plaintiff's contentions involved "health care services" administered in support of the state's response to the COVID-19 pandemic. Beaumont defendants further argued that because MCL 691.1475 was applicable, plaintiff was required to advance sufficient allegations of willful misconduct, gross negligence, intentional and willful criminal misconduct, or intentional infliction of harm to overcome immunity. Beaumont defendants asserted, "To the extent that Plaintiff's Complaint is intending to assert a cause of action for negligence, instead of, or in addition to, medical malpractice," plaintiff neglected to adequately plead an ordinary negligence or gross negligence theory. Plaintiff responded that Beaumont defendants did not have immunity under the PHCIA, asserting that the care provided by defendants was not in furtherance of the state's response to the COVID-19 pandemic because any failure to implement proper pressure-wound care was unrelated to COVID-19.

Following a hearing, the trial court granted Beaumont defendants' motion for summary disposition opining:

> You indicated that this gentleman was taken to the hospital because he was sick and it was later determined, while he was in the hospital, that he had [COVID-19] and what it says is that [] healthcare services in support of response to the [COVID-19] pandemic and that's clearly what this was. This was a [COVID-19]— a [COVID-19] situation that the hospital had to deal with and for those services . . . .
>
> * * *
>
> There's a whole—there's a whole lot of people who didn't survive. So, in terms of the services, they provided appropriate services 'cause this man is still alive and we know there's a whole host of people who aren't. So, I can cut to the chase and you can appeal it. Taking the evidence in a light most favorable to the nonmoving party, the Court finds that there is not a—that there's a basis to grant

-4-

the motion for summary disposition based upon the Pandemic Healthcare Act, MCL 691.1475 and, like I said, this will be a case of first impression.

The court subsequently entered an order awarding summary disposition to all Beaumont defendants consistent with its statements on the record.

On September 5, 2023, Fairlane Senior Care moved for summary disposition under MCR 2.116(C)(7) and (C)(8), essentially advancing identical arguments as Beaumont defendants regarding the applicability of MCL 691.1475, as a "health care facility" providing medical services to plaintiff "in response to his diagnosis of COVID-19." On September 7, 2023, Prime Homecare moved for summary disposition under MCR 2.116(C)(7), (C)(8), and (C)(10) similarly asserting that plaintiff's action was barred under MCL 691.1475 considering his "claims relate to the healthcare services that [Prime Homecare] provided him at his home following his hospitalization for COVID in the midst of the pandemic." Both Prime Homecare and Fairlane Senior Care contended that plaintiff neglected to advance a viable gross negligence claim. In response, plaintiff essentially reiterated his arguments regarding the limited administration of MCL 691.1475 to COVID-19 care.

The trial court held a hearing regarding Fairlane Senior Care's and Prime Homecare's respective motions for summary disposition. When the court inquired whether plaintiff solely raised ordinary negligence claims against Fairlane Senior Care and Prime Homecare, and defendants' counsel responded affirmatively, plaintiff's counsel did not challenge that contention. The trial court first granted Prime Homecare's motion for summary disposition opining that plaintiff's complaint solely contained allegations "that sound in ordinary negligence," as opposed to willful misconduct, gross negligence, intentional or willful criminal conduct, or intentional infliction of harm, such that the nonliability provision of MCL 691.1475 barred plaintiff's claims. The court subsequently granted Fairlane Senior Care's motion for summary disposition stating:

> Okay. And as the Court previously articulated relative to Prime [Homecare], the statute is clear. The Court stated the statute on the record and the only basis for the statute not to be of an exception to the statute would be one in which some sort of willful misconduct, gross negligence, or intentional act was perpetrated against the plaintiff and, here, as has been indicated, the claims that were raised are those that sound in negligence, ordinary negligence, in terms of the—the malpractice. And, as the Court indicated, these—the services that were rendered by Fairlane [Senior Care] fell within the timeframe covered by the statute and, in this case, the services were rendered to Mr. Johnson by Fairlane [Senior Care] in April, 2020 through May 12, 2020, and those time periods clearly fall within the parameters exercised by the statute. Taking the evidence in the light most favorable to the nonmoving party, the Court is satisfied and the Court will grant . . . summary disposition, as to Fairlane [Senior Care], as well. And, that being said, we know that Beaumont and Trenton, Oakwood, all those facilities were previously out. So, that will—this will be a final order in this case, and it'll dismiss the case in its entirety and the Court will dismiss these claims with prejudice.

On December 13, 2023, the trial court entered an order granting Prime Homecare's motion for summary disposition. On January 10, 2024, the court entered an order granting Fairlane Senior

Care's motion for summary disposition, stating "This Final Order DOES dispose of the last pending claim and DOES close the case." This appeal ensued.

## II. STANDARDS OF REVIEW

"We review de novo a trial court's decision on a motion for summary disposition." *Meemic Ins Co v Fortson*, 506 Mich 287, 296; 954 NW2d 115 (2020). "In addition, statutory interpretation is an issue of law, which we also review de novo." *Id*. "De novo review means that we review the legal issue independently, giving 'respectful consideration, but no deference' to the trial court's conclusion." *Velocity MRS Fund IV v Nextgen Pain Assoc & Rehab*, 346 Mich App 42, 46; 11 NW3d 302 (2023) (citation omitted). "A motion for summary disposition brought under MCR 2.116(C)(7) may be granted when a claim is barred by immunity." *Mays v Governor*, 506 Mich 157, 181; 954 NW2d 139 (2020). Under MCR 2.116(C)(7), "the nonmovant's well-pleaded allegations must be accepted as true and construed in the nonmovant's favor," and the court must further consider "any affidavits, depositions, admissions, or documentary evidence that has been filed or submitted by the parties." *Amburgey v Sauder*, 238 Mich App 228, 231; 605 NW2d 84 (1999).

"A motion under MCR 2.116(C)(8) tests the *legal sufficiency* of a claim based on the factual allegations in the complaint." *El-Khalil v Oakwood Healthcare*, *Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "When considering such a motion, a trial court must accept all factual allegations as true, deciding the motion on the pleadings alone." *Id*. at 160. "A motion under MCR 2.116(C)(8) may only be granted when a claim is so clearly unenforceable that no factual development could possibly justify recovery." *Id*.

Comparatively, a motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the claim; summary disposition under MCR 2.116(C)(10) is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id*. "A genuine issue of material fact exists when the record " 'leave[s] open an issue upon which reasonable minds might differ.' " *Johnson v Vanderkooi*, 502 Mich 751, 761; 918 NW2d 785 (2018) (citation omitted). "In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Patel v FisherBroyles*, *LLP*, 344 Mich App 264, 271; 1 NW3d 308 (2022) (quotation marks and citation omitted).

## III. ANALYSIS

### A. THE PHCIA

Preliminarily, and before addressing the substantive grounds of plaintiff's appeal, we review the legislative history and purpose underlying the enactment of the PHCIA. In response to the COVID-19 pandemic, "one of the most threatening public-health crises of modern times," the Governor "issued Executive Order (EO) No. 2020-04, declaring a 'state of emergency' under the [Emergency Powers of the Governor Act (EPGA), MCL 10.31 *et seq*.] and the [Emergency Management Act of 1976 (EMA), MCL 30.401 *et seq*.]" *In re Certified Questions from United States Dist Court*, *Western Dist of Michigan*, *Southern Div*, 506 Mich 332, 337-338; 958 NW2d 1

(2020). Subsequent to the declaration of the state of emergency, the Governor "issued various executive orders in response to the burgeoning health crisis, many of which were directed at healthcare providers." *Franklin v McLaren Flint*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 366226); slip op at 4.[7]

Pertinent to the issues on appeal, the Governor promulgated Executive Order No. 2020-30, provisionally suspending Article 15 of the Public Health Code, MCL 333.16101 *et seq.*, to enable healthcare facilities to effectively respond to the COVID-19 pandemic. EO 2020-30, issued on March 29, 2020, conferred immunity upon healthcare facilities and professionals under specified circumstances, as set forth in the following language:

> Consistent with MCL 30.411(4), any licensed health care professional or designated health care facility that provides medical services in support of this state's response to the COVID-19 pandemic is not liable for an injury sustained by a person by reason of those services, regardless of how or under what circumstances or by what cause those injuries are sustained, unless it is established that such injury or death was caused by the gross negligence, as defined in MCL 30.411(9), of such health care professional or designated health care facility.

The purpose of the cited executive order was as articulated:

> Responding effectively to the urgent and steep demands created by the COVID-19 pandemic will require the help of as many health care professionals as possible, working in whatever capacities are appropriate to their respective education, training, and experience. To ensure health care professionals and facilities are fully enabled to provide the critical assistance and care needed by this state and its residents during this unprecedented emergency, it is reasonable and

---

[7] We recognize that in subsequent opinions of this Court, both published and unpublished, this case has been cited variously as *Warran v McLaren Flint*, see *Skipper-Baines v Bd of Hosp Managers for City of Flint*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 365137); slip op at 4, as *Warren v Flint*, see *Anderson v Ascension Providence Hosp*, unpublished per curiam opinion of the Court of Appeals, issued December 18, 2024 (Docket No. 365559), p 1, and as *Warren v McLaren Flint*, see *Jokinen v Beaumont Hosp Troy*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 370983); slip op at 5; see also *Monroe v St Joseph Mercy Hosp, Pontiac*, unpublished per curiam opinion of the Court of Appeals, issued March 21, 2025 (Docket No. 368667), p 4; *Harris v Rhema-Belmont Operating, LLC*, unpublished per curiam opinion of the Court of Appeals, issued January 27, 2025 (Docket No. 366510), p 6. However, the aforementioned cases listed the plaintiff's first name in their respective citations due to a caption error, as indicated by the Michigan Supreme Court's order denying the plaintiff's application for leave to appeal in that case, which is captioned *Warren Franklin v McLaren Flint*. See *Franklin*, ___ Mich ___; 14 NW3d 263 (2024). Accordingly, we will cite this Court's opinion as *Franklin v McLaren Flint*.

necessary to provide limited and temporary relief from certain restrictions and requirements governing the provision of medical services. [EO 2020-30.]

On April 27, 2020, EO 2020-30 was rescinded pursuant to Executive Order No. 2020-61; however, the subsequent executive order extended the initial immunity provision previously afforded to healthcare providers. EO 2020-61 provided additional context regarding the evolution of the COVID-19 pandemic:

> In the three weeks that followed, the virus spread across Michigan, bringing deaths in the hundreds, confirmed cases in the thousands, and deep disruption to this state's economy, homes, and educational, civic, social, and religious institutions. On April 1, 2020, in response to the widespread and severe health, economic, and social harms posed by the COVID-19 pandemic, I issued Executive Order 2020-33. This order expanded on Executive Order 2020-4 and declared both a state of emergency and a state of disaster across the state of Michigan under section 1 of article 5 of the Michigan Constitution of 1963, the Emergency Management Act, and the Emergency Powers of the Governor Act of 1945.

On July 15, 2020, the Governor issued Executive Order No. 2020-150, which rescinded EO 2020-61, recognizing that the burden on hospital resources had abated and that the emergency measures previously enacted were no longer essential.

Approximately three months later, the Legislature enacted the PHCIA, effective October 22, 2020, thereby formally codifying, in part, the immunity provisions established in EO 2020-30 and EO 2020-61, as follows:

> A health care provider or health care facility that provides health care services in support of this state's response to the COVID-19 pandemic is not liable for an injury, including death, sustained by an individual by reason of those services, regardless of how, under what circumstances, or by what cause those injuries are sustained, unless it is established that the provision of the services constituted willful misconduct, gross negligence, intentional and willful criminal misconduct, or intentional infliction of harm by the health care provider or health care facility.

This immunity is applicable to services provided "on or after March 29, 2020 and before July 14, 2020." MCL 691.1477. The PHCIA defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results," and "willful misconduct" as "conduct or a failure to act that was intended to cause harm." MCL 691.1473(a) and (e).

This Court has previously addressed and clarified the limitations and scope of the PHCIA in three published decisions. First, in *Franklin*, ___ Mich App at ___; slip op at 9, the plaintiff sought medical treatment at the defendant's hospital on March 31, 2020, "because he had shortness of breath and was admitted to the COVID-19 floor where he was intubated." The plaintiff subsequently tested positive for COVID-19. *Id*. The plaintiff further developed pressure ulcers during his hospitalization, resulting in his transfer to the Veterans Affairs Ann Arbor Healthcare System for treatment for respiratory failure and a sacral decubitus ulcer. *Id*. Following his

discharge, the plaintiff filed suit against the defendant for purported "negligent or grossly negligent acts or omissions" involving the hospital and its nursing staff, but his attached affidavit of merit omitted any mention of gross negligence. *Id*. at ___; slip op at 2. The trial court granted summary disposition under MCR 2.116(C)(7) and (C)(8) because the plaintiff sustained pressure ulcers while he was hospitalized for COVID-19, and the plaintiff failed to plead sufficient facts to support a finding of gross negligence. *Id*. at ___; slip op at 3. The court further determined "that MCL 691.1475 was not vague as applied to plaintiff's set of circumstances." *Id*.

On appeal, the *Franklin* plaintiff contended that "the wound care he received was provided by defendant in the ordinary course of business as a private hospital and not in support of a state vaccine mandate or other state mandate or policy." *Id*. at ___; slip op at 6 (footnote omitted). This Court was unpersuaded by that argument, stating that the care provided to the plaintiff met the statutory definition of "health care services" as set forth in MCL 691.1473(d). *Id*. at ___; slip op at 6-7. In construing the statutory language, the *Franklin* Court resolved that the provision was applicable to the defendant "if it provided any healthcare services that assisted, helped, or promoted the state's reactions and actions taken as a result of the COVID-19 pandemic." *Id*. at ___; slip op at 8. This Court further opined, "This language includes the healthcare services that healthcare facilities like defendant gave to those infected with COVID-19 and regular healthcare services provided during the statutory period." *Id*. The *Franklin* Court additionally determined that the broad statutory language "demonstrates that all possible deaths or injuries are covered by the statute unless excepted." *Id*. at ___; slip op at 9. This Court emphasized that the plaintiff "presented at the hospital with signs of COVID-19, was admitted to the COVID-19 floor for COVID-19 treatment, and allegedly developed pressure ulcers as a result of that care," such that the "sequence of events is covered by the plain language of the statute." *Id*. at ___; slip op at 9-10.

This Court examined the PHCIA, for the second time, in *Skipper-Baines v Bd of Hosp Managers for the City of Flint*, ___ Mich App ___; ___ NW3d ___ (2024) (Docket No. 365137), several weeks after the issuance of *Franklin*. In *Skipper-Baines*, ___ Mich App at ___; slip op at 1, the 91-year-old decedent was admitted to the defendant's medical center after his daughter found him unresponsive; the defendant "placed the decedent in a room that he shared with a mentally unstable roommate who had a known propensity for violent outbursts." While hospitalized and receiving treatment for his gallbladder disease, the roommate attacked the decedent with an IV pole, inflicting serious harm and rendering the decedent nonresponsive. *Id*. at ___; slip op at 1-2. Despite receiving care, the decedent continued to deteriorate and ultimately died. *Id*. at ___; slip op at 2. The decedent had contracted COVID-19 "at some point" after his admission to the hospital, and an autopsy report provided that he had died from pneumonia associated with COVID-19. *Id*. The plaintiff, on behalf of the decedent's estate, pursued medical malpractice and ordinary negligence claims "arising from the acts and omissions of [the] defendant that made it possible for the decedent to be assaulted by his roommate." *Id*. The plaintiff asserted that "the decedent should not have been placed in a room with a mentally unstable person known to be violent and that defendant's staff should have been better equipped to intervene in the event of a violent outburst." *Id*. The trial court disagreed, awarding summary disposition under MCR 2.116(C)(7) because the defendant was immune from liability under the PHCIA. *Id*.

This Court reversed opining, "The services that allegedly caused the injury in this case were not given 'in support of this state's response to the' pandemic. This lawsuit stems entirely

from the beating inflicted upon the decedent by his roommate." *Id*. at ___; slip op at 3. The *Skipper-Baines* Court noted that the record indicated that "the decedent did not contract COVID-19 until after he was hospitalized due to an unrelated illness, and at the time of the attack, he was recovering from a gallbladder procedure," and the roommate "was likewise not being treated for COVID-19, and there is no suggestion that COVID-19 in some way spurred the attack." *Id*. This Court further reasoned, "The alleged negligent act was placing him in a room with an unsafe roommate, and the alleged omission was failing to deploy adequate safeguards to protect the decedent from the roommate whom was known to be unsafe." *Id*. Accordingly, the *Skipper-Baines* Court resolved:

> It is clear to us that neither of those were done in support of the pandemic response. There certainly will be gray area with respect to whether medical services were offered in support of the state's pandemic response, but this particular case is black and white. The alleged acts, omissions, and injuries were wholly unrelated to the pandemic, so deeming defendant immune would contravene the Legislature's clearly-communicated intent to limit this immunization to services stemming from the pandemic. The fact that the decedent apparently contracted COVID-19 at some point following his admission does not change the fact that he was not being treated at the hospital for COVID-19 or that the incident giving rise to this litigation was completely separate. [*Id*.]

This Court clarified, "We do not hold that immunity only applies when a patient is being treated for COVID-19, but it is clear that there must be some connection," and in the present case "there was absolutely no connection between the alleged malpractice and the pandemic" despite the decedent's death being attributable to COVID-19 complications. *Id*. at ___; slip op at 4. In light of the foregoing, the *Skipper-Baines* Court reversed the award of summary disposition to the hospital defendant. *Id*. at ___; slip op at 5.

The third published case in which this Court scrutinized the PHCIA is *Jokinen v Beaumont Hosp Troy*, ___ Mich App ___; ___ NW3d ___ (2025) (Docket No. 370983). In *Jokinen*, "the 88-year-old decedent was transferred from a senior living facility to Beaumont Hospital–Troy, suffering from 'altered mental status' after a fall." *Jokinen*, ___ Mich App at ___; slip op at 1. The initial medical examination of the decedent did not reveal any pressure-related injuries, but tests indicated a medium-to-high risk of developing pressure injuries. *Id*. Two days after the decedent's admission to the defendant hospital, a skin tear on her buttocks was first observed, and for the next 10 days, the decedent received treatment for that injury, in addition to other wound care. *Id*. at ___; slip op at 1-2. The decedent was eventually discharged and transferred to the defendant nursing home, Wellbridge, where despite notice of her pressure injury, the decedent's condition declined over the following three weeks. *Id*. at ___; slip op at 2. While the decedent "was repeatedly assessed for COVID-19 symptoms, no such symptoms were ever noted." *Id*. Approximately a month later, the decedent was transferred to Beaumont Hospital at her son's request, where she was admitted with a sacral decubitus ulcer. *Id*. The decedent passed away two days later, with her death certificate listing her cause of death "as sepsis due to infected decubitus ulcer, cardiomyopathy, and CAD, meaning coronary artery disease." *Id*. The decedent's estate subsequently initiated suit, advancing medical malpractice and negligence claims against the defendants and their respective nursing staff for " 'one or more negligent acts and/or grossly negligent acts and/or omissions, and breach[ing] the applicable standard of care.' " *Id*. However,

-10-

the pertinent affidavit of merit did not include express assertions of gross negligence. *Id*. The trial court granted summary disposition to the defendants under MCR 2.116(C)(8), because the "plaintiff's complaint failed to allege willful misconduct, gross negligence, intentional and willful criminal misconduct, or intentional infliction of harm, thereby failing to state a viable claim." *Id*. at ___; slip op at 3-4.

This Court disagreed with the trial court's rulings, concluding that the defendants were not immune from liability for medical malpractice and ordinary negligence. *Id*. at ___; slip op at 7. The *Jokinen* Court explained, "Unlike the plaintiff in [*Franklin*] the decedent in this case was not admitted to the hospital with symptoms of COVID-19, she was never treated for COVID-19, and there is no indication that she ever tested positive for COVID-19." *Id*. This Court further opined, "Indeed, those facts make the request for immunity here even weaker than the immunity claim that this Court rejected in *Skipper-Baines*, where the decedent suffered injuries unrelated to COVID-19, but subsequently contracted COVID-19 while hospitalized, and then died of the disease." *Id*. This Court additionally noted, "Because relief under MCR 2.116(C)(8) depends on nothing but the contents of the pleadings, . . .we cannot review evidence or factual allegations presented by defendants," including the defendants' contentions that the alleged deficiency in addressing the decedent's pressure ulcers was " 'a byproduct of the very demands, restrictions, protocols, uncertainties, and overall chaos considered by the governor and the legislature.' " *Id*. But the *Jokinen* Court resolved, "Beyond that, if we accept [the] defendants' capacious approach to the immunity granted by the PHCIA in MCL 691.1475, it is difficult to imagine any scenario in which a medical malpractice suit arising from acts and omissions occurring during the COVID-19 emergency could proceed." *Id*. (quotation marks and citation omitted). This Court reversed the trial court's award of summary disposition to the defendants and remanded the matter for further consideration. *Id*.

## B.  APPLICATION OF THE PHCIA

As a preliminary matter, it is undisputed that defendants are a "health care provider or health care facility," within the meaning of MCL 691.1475, and that the acts or omissions underlying plaintiff's medical malpractice action occurred during the statutory period, MCL 691.1477. Rather, plaintiff argues that the PHCIA was inapplicable to his claims because he was not harmed because of healthcare services provided to him in support of the state's response to the COVID-19 pandemic and the injuries were unrelated to treatment for COVID-19. Plaintiff further contends that the care he received—or the lack thereof—which resulted in the development of the pressure ulcers, constituted treatment that was routinely provided as part of defendants' regular operations, rather than care unique to the COVID-19 pandemic. Plaintiff ultimately argues that the trial court erred by granting summary disposition to defendants on immunity grounds because his claims were not barred by MCL 691.1475.

Applying binding precedent and considering the purpose and language of the PHCIA, we opine that defendants were immune from liability for medical malpractice and ordinary negligence. In the present case, plaintiff was admitted to Beaumont Hospital-Trenton because of his COVID-19 symptoms, and he received a diagnosis of COVID-19. Much like the plaintiff in *Franklin*, plaintiff allegedly developed pressure ulcers following admission due to Beaumont defendants' alleged neglect, and the ulcers subsequently worsened while under the care of Fairlane Senior Care

-11-

and Prime Homecare. Further, while being treated by the latter defendants, plaintiff continued to receive services for respiratory distress associated with COVID-19, in conjunction with wound care. Notwithstanding that the wound management was not directly in response to his COVID-19 diagnosis, as in *Franklin*, there is a sufficient connection between the pressure ulcers caused by the alleged lack of care that plaintiff received and the pandemic.

In contrast to the decedents in *Skipper-Baines* and *Jokinen*, whose admissions, treatments, and injuries were fundamentally unrelated to the COVID-19 pandemic, the instant plaintiff, through his care at all three facilities, was subject to services related, in part, to COVID-19. Moreover, the *Franklin* Court expressly held the immunity provision of MCL 691.1475 extended to "injuries and deaths that arose out of a healthcare facility's treatment, both *regular care* and COVID-19 care, in support of the state's response to the COVID-19 pandemic during the statutorily designated time period: March 29, 2020 until and including July 14, 2020." *Franklin*, ___ Mich App at ___; slip op at 13 (emphasis added). Additionally, despite plaintiff's contentions that the state did not (1) compel plaintiff or other persons to visit defendants, (2) identify defendants as facilities providing specialized COVID-19 treatment, or (3) direct plaintiff to seek treatment from defendants, "[t]here is no language suggesting that any of these measures were needed for a hospital, such as defendant, to support the state's reactions and actions in response to the COVID-19 pandemic." *Id*. at ___; slip op at 9. Ultimately, just like the *Franklin* plaintiff, the present plaintiff "presented at the hospital with signs of COVID-19, was admitted to the COVID-19 floor for COVID-19 treatment, and allegedly developed pressure ulcers as a result of that care," and these circumstances are "covered by the plain language of the statute." *Id*. at ___; slip op at 9-10. Consequently, defendants, in providing those healthcare services to plaintiff, are entitled to immunity unless an exception to immunity applies.

Plaintiff further argues that his injuries were caused by the negligent omissions of defendants, i.e., neglect, rather than the actions of defendants, and such negligent omissions did not fall within the scope of the immunity provided by the PHCIA. But in *Franklin*, the plaintiff likewise alleged that the development of his pressure ulcers was attributable to the acts and omissions of the defendant, including a list of actions that the defendant neglected to administer like turning, repositioning, and offloading patients to prevent pressure ulcers for those at risk of sustaining such injuries. *Id*. at ___; slip op at 2. Further, in *Skipper-Baines*, although this Court concluded the immunity provision was inapplicable to the defendant, it nonetheless considered the purported acts and omissions alleged by the plaintiff in resolving the matter. See *Skipper-Baines*, ___ Mich App at ___; slip op at 3 ("The alleged acts, *omissions*, and injuries were wholly unrelated to the pandemic, so deeming defendant immune would contravene the Legislature's clearly-communicated intent to limit this immunization to services stemming from the pandemic.") (Emphasis added.)

Notably, MCL 691.1475 does not differentiate between affirmative acts or the failure to act, rather, the statutory language provides that healthcare providers and healthcare facilities are "not liable for an injury, including death, sustained by an individual by reason of those services, *regardless of how*, *under what circumstances, or by what cause those injuries are sustained . . . .*" (Emphasis added.) As previously explained, the purpose of the PHCIA was to address the significant burdens imposed on healthcare providers in managing the pandemic, which naturally extends to the omission of certain treatments or services. See *Auto Club Ins Ass'n v Hill*, 431 Mich 449, 455; 430 NW2d 636 (1988) ("In construing a statute, this Court must discern the intent of the

Legislature in enacting the relevant provision" by first looking "to the language of the statute itself. After considering the language and general scope of the act, we may determine legislative intent in light of the purpose it seeks to accomplish or the evil it seeks to remedy.") Given the foregoing, and because this case presents essentially identical facts as *Franklin*, we conclude that defendants are immune from liability for its alleged omissions in providing care to plaintiff, pursuant to MCL 691.1475.

Plaintiff raises additional arguments regarding the viability of a gross negligence claim against defendants and the alleged unconstitutional vagueness of MCL 691.1475. However, plaintiff failed to preserve these issues by raising them in the trial court. *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, 347 Mich App 280, 293-294; 14 NW3d 472 (2023). A review of the record does not indicate that our failure to consider these issues would result in manifest injustice or that consideration of these issues is necessary for a proper determination of the case, *id*., particularly as these contentions were already rejected by this Court in *Franklin*. See *Franklin*, ___ Mich App at ___; slip op at 12 ("Plaintiff received his alleged pressure injuries during his treatment for COVID-19 in defendant's care. Accordingly, under the plain language of MCL 691.1475 in light of the facts of this case, the statute is not void for vagueness.") See also *id*. at ___; slip op at 10 ("Plaintiff . . . failed to provide any supporting evidence or indicate the existence of any evidence that may be uncovered in discovery to support his gross-negligence theory.") Plaintiff has thus waived these issues on appeal and we decline to address them.

Plaintiff also broadly asserts that *Franklin* was wrongly decided, but provides no further explanation or argumentation as to why, thereby abandoning this issue on appeal. See *Houghton ex rel Johnson v Keller*, 256 Mich App 336, 339; 662 NW2d 854 (2003) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give issues cursory treatment with little or no citation of supporting authority.") (Citations omitted.) Ultimately, based on the foregoing analysis, we conclude that the trial court properly granted summary disposition in favor of defendants.[8]

Affirmed.

/s/ James Robert Redford
/s/ Kathleen A. Feeney
/s/ Mariam S. Bazzi

---

[8] While Fairlane Senior Care advances a jurisdictional challenge in its brief on appeal, this Court has jurisdiction of this appeal because it is timely filed in relation to the final order as defined in MCR 7.202(6)(a)(i) and the accurate or complete identification of the final order or other non-final orders as the order or orders appealed from in the claim of appeal is not a matter of jurisdiction in an appeal in a civil action.